HOWARD et al. v. CITY OF BUFFALO et al.

(Supreme Court, Equity Term, Erie County.   January, 1907.)

1. WATERS AND WATER COURSES (§ 171*)—OBSTRUCTING WATER IN NATURAL STREAMS—LIABILITY.

A railroad maintaining a bridge over a river and interfering with the free passage of all water which may reasonably be anticipated in times of ordinary flood is liable for the damages sustained.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 216–222;  Dec. Dig. § 171.*]

2. RAILROADS (§ 108*)—OBSTRUCTING NATURAL STREAMS—LIABILITY.

The declaration in Laws 1884, c. 201, that railroad bridges over a river are lawful structures, refers to the manner of the construction of the bridges at the time, and the act of the railroads in closing the various openings in the approaches to the bridges and in dumping stone into the river so as to interfere with the free passage of the water in the river operated to make the bridges unlawful structures and a nuisance.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 108.*]

3. WATERS AND WATER COURSES (§ 177*)—OBSTRUCTING WATER IN NATURAL STREAMS—LIABILITY.

Where the acts of a railroad maintaining a bridge over a river in obstructing the free passage of the flow of the water in the river by filling in the openings to the approaches to the bridge and dumping stone into the river were committed within 20 years, an owner of land damaged by floods because of the interference with the passage of the water in the river was entitled to a mandatory injunction requiring the removal of the obstructions to the free passage of the water.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 260, 261;  Dec. Dig. § 177.*]

4. WATERS AND WATER COURSES (§ 171*)—OBSTRUCTIONS—LIABILITY.

Where a city acquired a highway across the flood channel of a river, and materially lessened the flood-carrying capacity of the openings through or under the highway by filling up sluiceways and ditches originally placed to take care of the water naturally flowing down the channel, and also lowered the grade of the highway, and thereby destroyed it as a natural barrier that had existed for more than 40 years, which preserved the natural efficiency of the flood channel to accommodate the ordinary flood waters, the city was liable for damages to the land of an individual by overflows caused by such acts.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 171.*]

5. WATERS AND WATER COURSES (§ 171*)—OBSTRUCTING WATERS IN STREAMS —LIABILITY.

A city maintaining a highway over the flood channel of a river need not provide openings therein adequate to carry all the water in case of extraordinary floods, because it cannot reasonably anticipate the occurrence of such floods.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 171.*]

6. WATERS AND WATER COURSES (§ 171*)—OBSTRUCTING WATERS IN STREAMS —LIABILITY.

The failure of a city to cause the removal of obstructions placed in a river within its limits by railroads maintaining bridges across the river is not such negligence as makes it liable for the flooding of lands of in-

dividuals in consequence of such obstructions interfering with the free passage of the water in time of ordinary floods.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 171.*]

7. WATERS AND WATER COURSES (§ 177*)—FLOODING LANDS—LIABILITY.

Where a railroad maintaining a bridge over a river filled up the channel under its bridge with stone, and thereby interfered with the flow of the water under the bridge, and the act of the railroad was committed within 20 years, a mandatory injunction may issue at the suit of an owner of land, damaged by ordinary floods in consequence of the obstructions, for the removal thereof, and to compel the railroad to restore the river channel to its former condition.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 261; Dec. Dig. § 177.*]

8. WATERS AND WATER COURSES (§ 177*)—FLOODING LANDS—LIABILITY.

Where a railroad which crossed a river on an open trestle and bridge over the channel and low ground, forming a part of the channel in time of ordinary floods, filled in the trestle and dumped stone into the channel under the bridge, and thereby rendered the channel insufficient to take care of the water in time of ordinary flood, the erection of the embankment made the bridge abutments and piers unlawful structures and a nuisance, authorizing relief in equity by an owner of land damaged by floods in consequence thereof.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 260, 261; Dec. Dig. § 177.*]

9. WATERS AND WATER COURSES (§ 171*)—OBSTRUCTION—LIABILITY.

Conveyances of land to railroads binding them to maintain proper ditches of sufficient depth to carry off water, executed when the railroads maintained tracks across a natural stream in such a way as to permit the passage of ordinary flood waters, do not authorize the railroad to close the openings, and where they do so, causing the waters to set back on the land owned by persons claiming through the grantors to the railroad, such persons may sue for the negligent failure of the railroads to maintain an ordinary outlet and water course open and unobstructed.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 171.*]

10. WATERS AND WATER COURSES (§ 171*)—OBSTRUCTION—LIABILITY.

A deed conveying land to a railroad described it as "center line of the railway of the party of the second part, as laid down on a map of such railway," etc. The map referred to showed, in addition to the location of the railroad, a profile of the same, giving the elevations as contemplated. The profile showed no openings in the proposed embankments at a natural water course. *Held*, that the reference to the map was for the mere purpose of fixing the place of the center line of the proposed railroad, and the deed was not a grant of the privilege of constructing a railroad with a water-tight embankment.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 171.*]

11. RAILROADS (§ 107*)—WATERS AND WATER COURSES—OBSTRUCTION—LIABILITY.

Railroad Law (Laws 1890, c. 565) § 11, provides that every railroad which shall build its road across any water course shall restore it to its former state. An owner contracted to convey a strip of land to a railroad, and it covenanted to construct a ditch along the side of the strip suitable for drainage. The contract stated that it was intended to construct a railroad switch track located on an earth embankment on the premises to be conveyed, and that, as the embankment on a portion of the premises would not admit of the construction of ditches on the premises conveyed, the owner's lands adjoining the premises conveyed, not

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

exceeding four feet in width, might be used for such ditches, and the railroad also agreed to construct a switch as delineated on a plan, on an earth embankment. *Held* that, though the contract was silent as to any required openings through the proposed embankment, the obligation of the railroad in constructing the proposed embankment to restore a water course to its former state of usefulness was not released by the contract.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 107.*]

12. RAILROADS (§ 107*)—REGULATION—WATERS AND WATER COURSES—OBSTRUCTION—LIABILITY.

The benefits secured by Railroad Law (Laws 1890, c. 565) § 11, requiring every railroad building its road across any water course to restore the same to its former state, are for the private advantage of owners of lands, and may be conveyed.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 107.*]

13. WATERS AND WATER COURSES (§ 178*)—FLOODING LANDS—MEASURE OF DAMAGES.

The measure of damages caused by the flooding of land by the maintenance of a railroad of obstructions in a stream is the depreciation in the value of the annual use of the premises caused by the obstructions, and not compensation for a permanent injury because the obstructions cannot be treated as permanent because they are to be removed in pursuance of the judgment of the court.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 251–255; Dec. Dig. § 178;* Damages, Cent. Dig. §§ 276½, 282.]

Action by Gibson Howard and another against the City of Buffalo and others. Judgment for plaintiff against all defendants.

Arthur C. Wade and Edward C. Randall, for plaintiffs.
Samuel F. Moran, for City of Buffalo.
William L. Marcy, for Buffalo Creek R. Co. and Erie R. Co.
Louis L. Babcock, for Delaware, L. & W. R. Co., New York, C. & St. L. R. Co., and South Buffalo Ry. Co.
William D. Hoyt, for Lake Shore & M. S. Ry. Co.
Frank Rumsey, for Pennsylvania R. Co.
James S. Havens, for Buffalo, R. & P. R. Co.

BROWN, J. The Buffalo river and the Cazenovia creek have their sources in streams in the western portion of Wyoming county, flow generally westerly across the center of Erie county, uniting at about South Park avenue, in the city of Buffalo; flowing thence in a general northwestern direction to Lake Erie, draining a watershed of about 400 square miles. From South Park avenue the river takes a very crooked and winding course of 6 miles to reach the lake, a distance of less than 2 miles, having a natural fall of about 5 feet; the water in ordinary stages being from 6 to 10 feet deep and about 150 to 200 feet wide, confined in a channel with generally abrupt banks, 4 to 8 feet above the water level, necessarily a slow and sluggish stream.

With quite persistent regularity this river reaches a highly flooded condition twice each year, generally once in the fall or winter and once in the spring. These floods have annually occurred since the earliest recollection of living witnesses. Prior to about the year 1888, the flooded area and the bounds of the river in its flooded condition were generally limited and confined by the clearly defined flood banks, mark-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ing with certainty what might be called the flood channel; this flood channel varying from 500 feet to 1,500 feet in width along the course of the river, and, excepting extraordinary rainfalls or sudden melting of very deep snow, securely keeping the river flood waters therein. Under conditions then existing, before the acts of the defendants complained of, ordinary floods did not overflow Buffalo river flood banks at Abbott Road in the vicinity of Hopkins street, and reach plaintiffs' lands.

At the time the defendants the Lake Shore & Michigan Southern Railway Company, the Buffalo Creek Railroad Company, the Pennsylvania Railroad Company, and the New York, Chicago & St. Louis Railroad Company constructed their bridges and approaches thereto across this flood channel, and the Delaware, Lackawanna & Western Railroad Company constructed its lower bridge and the approaches thereto across the same, openings were left in all their approaches to their said bridges, which resulted in allowing such river flood waters to flow down through the flood channel and escape to the lake without reaching plaintiffs' lands. These openings were maintained by the defendant the Lake Shore & Michigan Southern Railway Company from 1852 to 1888; by the defendant the Buffalo Creek Railroad Company from 1872 to September, 1886; by the defendants the Pennsylvania Railroad Company and the New York, Chicago & St. Louis Railroad Company from 1882 to 1892. Since the construction of such crossings over the Buffalo river flood channel, and within 20 years prior to the commencement of this action, all the last-named defendant railroad companies filled in all such openings with solid earth embankments, leaving no means for such flood waters to pass down such channel, except as were afforded by the channels under their respective bridges; and at about the same time all the said defendant railroad companies filled in all openings under their railroad tracks to the west of lands north of Tifft street for a long distance southerly from the Buffalo river. The defendant the Delaware, Lackawanna & Western Railroad Company, in about the year 1891, constructed a long earth embankment westerly from the point of the overflow of the Buffalo river in times of flood at Abbott street to its junction with the Buffalo Creek Railroad Company south of the Buffalo river. About the year 1895 the defendant the Buffalo Creek Railroad Company unloaded several car loads of heavy iron slag from its bridge into the river channel under said bridge; and in 1897 the defendant the Delaware, Lackawanna & Western Railroad Company dumped several car loads of stone into the river channel from its lower bridge. Since such openings in said approaches to said defendants' bridges and the openings under the railroad tracks to the west of lands north of Tifft street were closed, such obstructions placed in the river channel, and the embankment of the Delaware, Lackawanna & Western Railroad Company was erected, at times of ordinary flood the waters in the Buffalo river have risen to such a height as to flow over the south bounds of the flood channel at Abbott Road in the vicinity of Hopkins street, running thence southerly and westerly across lands north of Tifft street, unable to return to the river or escape to the lake by reason of the embankments of said defendant railroads, finally reaching plaintiffs' lands;

causing the damage complained of. Such flood waters so flowing over the south bounds of the flood channel of the Buffalo river at Abbott Road in the vicinity of Hopkins street were of the following depths on Abbott Road: December 16, 1895, 1.45 feet; May 20, 1894, 2.05 feet; March 20, 1896, 1.65 feet; January 13, 1898, 1.20 feet; January 15, 1900, .58 feet; February 9, 1900, 2.12 feet; December 14, 1901, .95 feet; April 22, 1901, 1.12 feet; March 1, 1902, 3.05 feet; January 29, 30, 1903, 1.12 feet; February 7, 8, 1904, 3.15 feet; March 3, 1904, .80 feet; March 19, 1905, 2.25 feet; December 6, 1906, .42 feet; February 15, 1908, 1.70 feet; February 24, 1909, .28 feet. Abbott Road at the point of overflow is about 10 feet above mean lake level.

It seems to be conceded by all parties that at the time when flood waters are escaping from the channel of the Buffalo river, at Abbott Road in the vicinity of Hopkins street in quantities sufficient to reach plaintiffs' lands, the entire flood waters in the channel are equivalent to a discharge of about 25,000 cubic feet per second down the channel. It is established by satisfactory evidence that the waters have a mean velocity of 4½ feet per second, from a point just above the Lackawanna Bridge to just below the Lake Shore Bridge. Dividing the quantity of the discharge per second by the velocity per second establishes the size of the cross-sectional area through which the quantity to be discharged will flow in a second. From this data it is seen that a cross-section of the flood waters would measure about 5,555 square feet, which would indicate the necessary minimum cross-sectional area of the space for the waters under each bridge; that any bridge affording a less area or cross-sectional space would not permit the passage of such waters without obstruction, unless a greater speed of current was created. With the flood water flowing over the south bank of the flood channel at Abbott Road, in the vicinity of Hopkins street, in sufficient quantities to injure plaintiffs' premises, the sectional area of the space actually occupied by the waters under defendants' bridges is as follows, as ascertained from the flood of 1904: Lake Shore and Michigan Southern Railway Company Bridge, with water at 6.85 feet above mean water level, 4,470 square feet; the Pennsylvania Railroad Company and the New York, Chicago & St. Louis Railroad Company Bridge, with water at 7.06 feet above mean water level, 3,862 square feet; the Buffalo Creek Railroad Company Bridge, with water at 7.06 feet above mean water level, 3,805 square feet; the Abbott Road Bridge, with water at 9.01 feet above mean water level, 3,216 square feet; the lower Delaware, Lackawanna & Western Railroad Company Bridge, with water at 8.08 feet above mean water level, 3,780 square feet.

A very careful and exhaustive comparison of all the testimony touching the capacity of these bridge openings justifies the acceptance of the foregoing figures as correct and reliable.

There is no answer to the proposition that it is impossible to get water requiring a channel measuring 5,555 square feet on a cross-section to pass through bridge openings having a capacity as above indicated without causing a large part of the water upstream from such openings being imprisoned and held back unless the current is increased

to a degree not to be attained in this tortuous, winding river, with only a fall of about 5 feet in about as many miles.

There is testimony to the effect that the discharge of 25,000 cubic feet per second is moving at the rate of 6½ feet per second, indicating that a bridge opening of 3,846 square feet sectional area affords sufficient capacity to accommodate all of such flood waters; from which data it would appear that all the bridge openings, as above measured, were of sufficient size, and that the approaches, abutments, and piers do not in fact obstruct the flood of the flood waters. Such testimony is not satisfactory. The testimony to the effect that when the river is in its normal, ordinary, bank-full condition, it occupies a space measured on a cross-section of 10,600 square feet area, and is moving at the rate of 4½ feet per second, might be accepted as reliable; but to adopt the arbitrary mathematical measurement of the flood waters filling a 25,000 square feet sectional area as moving 6½ feet per second as conclusive, in view of actual facts, is too untrustworthy as a foundation upon which to dispose of the issues presented by this evidence. The velocity of 6½ feet per second was ascertained by timing the passage of floats through a known distance on the surface of the water, computing the supposed difference in speed of the water at the bed of the river and reaching a conclusion as to the velocity of the whole body of water moving down stream, like measurements and computations made at various places along the six-mile course of the river, and an average or mean velocity ascertained, resulting in the claim that the entire body of flood waters measuring 25,000 square feet on a cross-section moves downstream at the rate of 6½ feet a second.

With such flood waters moving at the rate of 6½ feet a second, there would pass through the Lake Shore Bridge opening of 4,470 square feet in one second 29,055 cubic feet of water. The fact is that 25,000 cubic feet of water does not pass through this opening in one second; the fact is that the water in times of flood, reaching plaintiffs' lands from a place on Abbott Road, in the vicinity of Hopkins street, is five inches higher on the upstream side of the bridge than it is on the lower side at a time when the flood measures 25,000 square feet in sectional area.

With flood waters moving at the rate of 6½ feet a second, there would pass through the Pennsylvania Railroad and the New York, Chicago & St. Louis Railroad Bridge opening of 3,862 square feet in one second 25,105 cubic feet of water; the fact is that 25,000 cubic feet of water does not pass through the opening in one second; the fact is that the water in times of flood reaching plaintiffs' lands from a place on Abbott Road in the vicinity of Hopkins street, on the upper side of the bridge, is nine inches higher than on the lower side.

With flood waters moving at the rate of 6½ feet a second, there would pass through the Buffalo Creek Bridge opening of 3,805 square feet in one second 24,732 cubic feet of water; the fact is that that quantity of water does not pass through such opening in one second; the fact is that the water in times of flood reaching plaintiffs' lands from a place on Abbott Road in the vicinity of Hopkins street, on the upstream side of this bridge, is more than one foot higher than it is on the lower side.

With flood water moving at the rate of 6½ feet a second, there would pass through the lower Lackawanna bridge opening of 3,780 square feet in one second 24,570 cubic feet of water; the fact is that that quantity of water does not pass through such opening in one second; the fact is that in times of flood reaching plaintiffs' lands from a place on Abbott Road, in the vicinity of Hopkins street, the water on the upstream side of the bridge is more than one foot higher than it is on the lower side.

With flood waters moving at the rate of 6½ feet a second, there would pass through the upper Lackawanna bridge opening of 4,209 square feet in one second 27,358 cubic feet of water; the fact is that 25,000 cubic feet of water does not pass through such opening in one second; the fact is that in times of flood reaching plaintiffs' lands from overflow at Abbott Road at this bridge the water on the upstream side of the bridge is 12 to 18 inches higher than on its lower or downstream side.

While it may be true that a part of the flood waters are moving through the bridge openings at the rate of 6½ feet a second, yet it is also true that a large part of such waters are not moving at anywhere near that rate. If all of such flood waters were so moving, there would be no overflow of the flood channel of the river; there would be no appreciable difference between the height of water above and below such bridges. In whatever way the situation is examined, the conclusion is irresistible that none of these bridge openings, as left after the approaches, sluices, and ditches were filled up and stone, etc., dumped into the bridge openings, are of sufficient capacity to take care of the ordinary flood waters that were occasionally to be expected.

The fact is that the water does not go through the bridge openings. It in fact is set back and raised above these bridges. It in fact is higher above each bridge than immediately below. It in fact is higher above each railroad crossing than it would have been if the openings originally in the approaches had not been filled up. It in fact is higher above the upper Lackawanna Bridge, where it flows over the Abbott Road, than it would be if the said abutments, approaches, piers, and obstructions were not within its channel. It in fact does flow over the channel of the river at Abbott Road, in the vicinity of Hopkins street, the lowest point in the river bank and reaches plaintiffs' lands, causing the damage complained of.

The weight of evidence is that a channel formerly sufficient to discharge 25,000 cubic feet of water a second without injury to plaintiffs' premises has been filled in and obstructed by the approaches, abutments, and piers of these bridges and stone, etc., placed therein to such an extent that the full efficiency of the water course has been destroyed. The cause of the periodical flow of water over the south banks of the flood channel at Abbott Road, and the consequent flooding of plaintiffs' premises, are thus very readily accounted for. Instances could be vastly multiplied and particularized from the more than 4,000 pages of testimony placing the cause of the floods that have flowed across Abbott Road upon plaintiffs' lands upon the defendants' failure to observe the imperative necessity of crossing the flood channel in such a manner as to leave sufficient openings for the passage of

ordinary flood waters. Such necessity was observed by these defendants when they originally constructed their various crossings, and they were maintained for many years with a view of allowing the ordinary flood waters to pass through their structures without injury and damage to the property of the plaintiffs and thousands of others owning and occupying lands annually flooded since about 1890. Since about that date the defendants greatly reduced the capacity of the openings in their crossings in violation of their obligation to see to it that they did not interfere with the free passage of all water which it might reasonably be anticipated would flow into and down the river in times of ordinary flood. The failure of the defendants to observe this requirement of law was negligence and rendered them liable for the consequences thereof.

The defendant the city of Buffalo acting under the provisions of chapter 527 of the Laws of 1906, has undertaken, and is now actively engaged in, the improvement of the Buffalo river by deepening and widening the channel, necessarily resulting in the removal of the railroad and highway bridges that now span the river; and whatever part these bridges, abutments, and piers have played in preventing and obstructing the flow of flood waters is in process of elimination. The plan of the proposed river improvement now being executed involves the deepening and widening of the stream from Hamburg street upstream to a point above the junction of the river and Cazenovia creek. Work is at present in actual progress under contract with the city requiring the dredging of the river to a depth of 20 feet below mean water level up to the Abbott Road Bridge, and the widening of the channel to 220 feet, exclusive of all piers. Such improvement is a vast undertaking, and is said by competent engineers to be adequate to furnish capacity for all ordinary floods and to prevent future flooding of plaintiffs' lands from the overflowing of Buffalo river at Abbott Road. The improvement at the Lake Shore & Michigan Southern Railway Company Bridge will result in a cross-sectional area of about 4,400 square feet below mean water level, and at 6.85 feet above that level, reached by the flood of 1904, in a cross-sectional area of 5,907 square feet; thus affording at this bridge apparently ample capacity. The same improvement at all other bridges on the river will restore to the channel at those points all the efficiency destroyed by the filling of the approaches, etc., to the bridges by the defendant railroads, and remove the cause of the damage to plaintiffs' lands. None of the railroad defendants offered any testimony relative to their co-operation with the city in this large improvement. It is apparent that, unless the defendants remove their embankments, abutments, and piers in the river below the Bailey Avenue Bridge, there will be no relief to the plaintiffs' lands as a result of the improvements in the river.

While it is true that, by chapter 201 of the Laws of 1884, the defendants' bridges were then declared to be lawful structures, such declaration must necessarily refer to the manner of their construction at that time, if in any particular that statute applies to the size or capacity of the opening for the passage of water. At the time the statute was passed, the defendant railroad had many openings in the approaches to such bridges, and the flood channel was not seriously obstructed. The

closing of these various openings was negligence and has made such bridges, their approaches, abutments, and piers, serious obstructions in the river; have made the bridges unlawful structures and a nuisance. The periodical flooding of the plaintiffs' land by the overflow of the Buffalo river at Abbott Road, caused by the defendants' unlawful structures, is a nuisance causing irreparable damage for which plaintiffs have no adequate remedy at law. The abutments and piers of the bridges of the Lake Shore & Michigan Southern Railway Company, the Buffalo Creek Railroad Company, the Pennsylvania Railroad Company, the New York, Chicago & St. Louis Railroad Company have been in place as now located for more than 20 years, and such railroad companies may have as against the plaintiffs secured the right by prescription to maintain the same as now constructed. The acts of these defendants, however, in filling in the openings to the approaches to their bridges and dumping stone, etc., into the river, were committed within 20 years prior to the commencement of this action.

The plaintiffs are entitled to a mandatory injunction requiring these defendants to remove the embankments constituting the approaches to their bridges, and to provide openings in such embankments which, with the openings under their bridges, shall be of sufficient capacity to permit 25,000 cubic feet of water, flowing at a speed of 4½ feet per second, to flow under their railroad tracks crossing the Buffalo river, without being obstructed when the water at the upper Lackawanna Bridge is 9 feet above city datum.

More than 40 years ago the Abbott's Corners Plank Road Company constructed the highway crossing of the Abbott Road through the flood channel of the Buffalo river. A bridge was erected upon the same abutments that now exist and ever since have been used as a foundation for the Abbott Road Bridge.

In 1890 the defendant the city of Buffalo acquired the rights of the plank road company. At that time there existed three sluiceways across the Abbott Road between Hopkins street and the Abbott Road Bridge of sufficient size to accommodate substantially all the water that could not flow down the channel under the Abbott Road Bridge; and upon each side of the Abbott Road Bridge, in the same vicinity, there were ditches running to the river. In times of ordinary floods, prior to 1890, the flood waters in the flood channel of the Buffalo river passed down through these sluiceways, ditches, and bridge openings, and did not reach plaintiffs' lands. After the defendant the city of Buffalo took over such Abbott Road highway, it rebuilt Abbott Road Bridge, using without change the abutments then existing, filled up the sluiceways and ditches with solid earth, and paved Abbott Road. By such act the city of Buffalo materially lessened the flood-carrying capacity of the openings through or under Abbott Road in its crossing of the Buffalo river flood channel and contributing to the raising of flood waters in the river at Abbott Road in the vicinity of Hopkins street sufficient to cause the overflow at that point and the injury to plaintiffs' lands. These sluiceways and ditches were originally placed in Abbott Road highway for the purpose of taking care of the water naturally flowing down the channel, and to close them all up tight and make no provision for this lost efficiency of the channel for flood-

carrying purposes was of such gross carelessness and in such disregard of the plaintiffs' rights as to constitute negligence; it was the creation of a nuisance, and for damages legitimately attributable thereto the municipality is liable. By closing these necessary openings under or through its highway, the municipality thereby forced upon the Abbott Road Bridge opening a far larger burden than it was capable of carrying, and, because of the insufficient carrying capacity of this bridge opening it then became, ever since has been, and now is, a nuisance, and it is negligence for the city of Buffalo to longer continue its dangerous condition.

At the time the city of Buffalo filled in such sluiceways and ditches, it also lowered the grade of Abbott Road in the vicinity of Hopkins street about one foot. Prior to the lowering of such grade, the Abbott Road roadbed at this place served in a substantial manner to retain the flood waters of Buffalo river in the flood channel at the time of ordinary floods, and by reason of such facts such flood waters did not reach plaintiffs' premises. The lowering of such grade partially destroyed a natural barrier that had existed for more than 50 years, which had in many ways preserved the natural efficiency of the flood channel to accommodate the ordinary flood waters. The partial destruction of this natural barrier or flood bank was a most careless and negligent act on the part of the city of Buffalo. The result of such act was clearly apparent and a violation of plaintiffs' right to have such flood channel bank preserved as a protection from the flood waters which always threatened to overflow the Abbott Road roadway at that point in times of ordinary flood.

The city of Buffalo, having negligently contributed to the cause of plaintiffs' injury, must respond in damages for the injuries it has occasioned, and be subjected to an injunction decree commanding the restoration of the flood channel of the Buffalo river at Abbott Road, between Triangle street and Lee street, to the same condition that existed immediately before said defendant filled up the sluiceways under, and the ditches on the sides of, Abbott Road and lowered the grade of said road.

While it is true that the defendant the city of Buffalo, through its common council, has committed itself to a plan of deepening and widening the river for a considerable distance upstream from Hamburg street, and such work is in actual progress from Hamburg street to the Abbott Road Bridge, yet the fact is that the subject of enlarging the channel of the river at Abbott Road rests solely on supposition. So far as the evidence upon this trial reveals, the city of Buffalo is under no contractual obligation to do any effective work that will afford practical relief from these floods on any part of the river upstream from a point just below Abbott Road Bridge. Of all the obstructions to the flow of flood waters down the flood channel of the Buffalo river, none is more effective than this Abbott Road Bridge. The flood waters when at the height of ordinary floods at Abbott Road require an area, measured by a cross-section, 5,555 square feet. Abbott Road Bridge with water at 9 feet above mean water level, which is a flood sufficient to flow over onto plaintiffs' lands, has a water space under of only 3,216 square feet. While it may be true

that the city of Buffalo does intend to carry out its approved plan of improving the river at Abbott Road and above, yet for the purpose of affording relief to the plaintiffs the court cannot assume that such improvement will in fact be made.  There can be no relief to the plaintiffs from the unlawful acts of the city of Buffalo in obstructing the flow of water in the Buffalo river flood channel, unless these obstructions are removed, and the channel restored to its former condition. To give any credence to the city's announced intention of removing its obstructions without providing that such obstructions be removed in fact would be fruitless and ineffectual.

It very satisfactorily appears that the damages occasioned plaintiffs' premises from flood waters of the Buffalo river and Cazenovia creek must be limited to injuries sustained by water overflowing the south flood channel bank of the river at Abbott Road in the vicinity of Hopkins street.  While it is true that the openings in the city highway bridges at Bailey avenue, South Park avenue, Stevenson street, Cazenovia street, Seneca street, and South Ogden street are far too small and utterly fail to furnish sufficient capacity for ordinary floods, and these bridges and their approaches do obstruct the flow of water in time of ordinary floods and cause much damage to property in their immediate vicinity, yet the plaintiffs are not entitled to any relief therefrom, for the reason that they do not cause plaintiffs any damage, for they do not contribute to any flood in the river at Abbott Road in the vicinity of Hopkins street that reaches plaintiffs' lands.  It is only on very rare occasions that any flood waters from Cazenovia creek or the Buffalo river above Abbott Road near Hopkins street reach the plaintiffs' premises.  For the past 40 years only three or four such floods have occurred.  They were caused by prolonged, heavy rains, sudden melting of exceptionally heavy snow, or by the sudden movement of very thick ice causing ice jams.  The city bridge openings were inadequate to carry such floods, and resulted in the flood waters being set back and raised to a sufficient height to flow southwesterly across Abbott Road east of Bailey avenue, and thence to plaintiffs' lands.  Such rare conditions could not reasonably have been anticipated, and the municipality was not guilty of any negligence in constructing such bridges and approaches that contributed to plaintiffs' injury.

The complaint contains no allegation charging the defendant city of Buffalo with negligence with reference to the overflow of South Park Lake, nor with reference to its failure to remove the obstructions in the river placed there by the remaining defendants.  Whatever testimony was received with reference to the overflow of South Park Lake must be stricken from the record as inadmissible under the pleadings.  Whatever there may be to the claim for damage caused by the overflowing of South Park Lake, it is of no importance, for the reason that the waters therefrom are so slight in amount that they in no way cause or contribute to any damage to plaintiffs' lands.

The failure of the city of Buffalo to cause obstructions placed in the river by the remaining defendants to be removed might possibly make the city liable for damages caused by such obstructions while the river was being used for navigation purposes; but the damage

caused plaintiffs in no manner arises from such a use. The failure on the part of the city to remove such obstructions so placed by the other defendants is not such negligence as to make it liable for the flooding of plaintiffs' premises. The affirmative act of the city in closing the openings under Abbott Road and closing the ditches on each side of Abbott Road between Hopkins street and Abbott Road Bridge, thus greatly impairing the flood-carrying capacity of the river channel, is of a far different character, and constitutes such negligence as renders the city liable to plaintiffs.

The evidence does not reveal any act of the defendant the Delaware, Lackawanna & Western Railroad Company with reference to its crossing of the flood channel at its lower bridge, within 20 years, that has contributed to plaintiffs' damage, except the filling up of the channel under its bridge with stone. A mandatory injunction is granted the plaintiffs requiring this defendant to remove all such stone from the river channel and restore the same to its former condition. An injunction has been awarded the city of Buffalo compelling this defendant to replace this bridge with one of the swing or draw type, so placed as to conform to the river improvement plans and the necessities of navigation; and all damage to plaintiffs by reason of present conditions at this railroad crossing will be eliminated.

The defendant the Delaware, Lackawanna & Western Railroad Company originally crossed the Buffalo river flood channel at its upper bridge upon an open trestle about one-fourth of a mile long, approaching the bridge from the east; this trestle carried the railroad tracks over this territory from about Prenat street to the bridge; the natural surface of the land for all this distance being very low, having a very slight elevation above the ordinary banks of the river, and in time of ordinary floods being fully covered and forming a part of the flood channel. In times of ordinary floods the flood waters were about one-fourth of a mile wide directly under the railroad tracks, but freely passing down the channel through such trestle without damage to plaintiffs' lands. In 1891 the defendant Delaware, Lackawanna & Western Railroad Company filled in this open trestle work with solid earth embankment from the eastern bank of the flood channel of the Buffalo river up to the east end of its upper bridge, leaving no openings therein of any character, and completely damming up the entire flood channel, except such opening as was provided under its bridge. In about 1895 the defendant Delaware, Lackawanna & Western Railroad Company unloaded several car loads of stone from this bridge into the river channel under the bridge, materially decreasing the efficiency of the flood-carrying capacity of the opening under its bridge. This bridge opening has a cross-sectional area below the surface of the water, when the water stands 4.30 feet above city datum, of 2,622 square feet. With water standing 4.30 feet above city datum, the Buffalo river is in a practically bank-full condition. It is beyond dispute that the space occupied by the water just above the Lackawanna Bridge, at a time when it overflows the south flood channel bank at Abbott Road in the vicinity of Hopkins street in quantities sufficient to reach plaintiffs' lands, measures at least 5,555 square feet on a cross-section. With water standing at an elevation of 10.25 above

city datum, at times of ordinary flood, at the upper Lackawanna
Bridge, the opening under the bridge actually occupied by water
measures on a cross-section 4,209 square feet.  It is apparent that
the opening provided by the defendant Delaware, Lackawanna &
Western Railroad Company at its upper bridge for the passage of flood
water down the flood channel is not much more than half large enough
to accommodate the water that might ordinarily be expected.  The
filling in of the long trestle across that low land and the dumping of
stone into the channel under the bridge, leaving such a meager open-
ing under this upper bridge, is an obstruction to the waters in Buffalo
river.  Such filling in and the erection of the tight embankment has
made the bridge, the abutments, and piers unlawful structures.  The
method adopted by the defendant Delaware, Lackawanna & Western
Railroad Company at its upper bridge to take care of ordinary flood
waters is a nuisance deliberately created in violation of plaintiffs'
rights, contributes with the acts of the other defendants to the plain-
tiffs' injury and damage, and constitutes negligence on its part for
which this defendant is liable to the plaintiffs.  The lay of the land is
such that the removal of this obstructing embankment from Prenat
street to the east end of the bridge would permit all flood waters that
ordinarily might be expected to flow down the Buffalo river flood
channel would find ample accommodations to pass under the Dela-
ware, Lackawanna & Western Railroad Company tracks at its upper
bridge, without regard to the question of whether the river is dredged
and deepened between the upper Lackawanna Bridge and the Abbott
Road Bridge.  A space of 4,400 square feet, sectional area, below
mean water level under this upper bridge, would provide a cross-sec-
tional area of something like 6,500 square feet, with water at 10 feet
above city datum.  It is unknown whether the Buffalo river will ever
be deepened and widened upstream from the Abbott Road Bridge to
the upper Lackawanna Bridge.  The court has no power to compel
such work.  The court has no power at this time to compel the Dela-
ware, Lackawanna & Western Railroad Company to reconstruct its
upper bridge opening in conformity to some supposed plan of deepen-
ing and widening the river by the city of Buffalo.  Ample power,
however, is possessed to compel this defendant to restore the flood
channel of the Buffalo river to its former state of usefulness by re-
moving the obstructions placed therein, which have in a measure de-
stroyed its efficiency for flood-carrying purposes, and contributed to
plaintiffs' damages.

A mandatory injunction is hereby granted directing the Delaware,
Lackawanna & Western Railroad Company to remove its earth em-
bankments from the east end of its upper bridge to the south side of
·Prenat street, to remove the stone placed in the river under its bridge,
and to restore the flood channel of the river between these points to its
former condition before such embankment was placed in such channel.

It is very evident that the Buffalo river cannot be improved, widened,
and deepened for navigation and flood abatement purposes unless these
bridges and railroad crossings over the river be reconstructed—bridges
'of a swing or draw type substituted—and the channel under such
'bridges made at least 220 feet wide and 20 feet deep below mean

water level.' Such reconstruction of all railroad and highway bridges and crossings below Bailey Avenue Bridge down to and including the Lake Shore Bridge would eliminate all causes of plaintiffs' damage due to the negligent acts of the defendants in obstructing the flood channel of the Buffalo river. It is quite likely that all such defendants will comply with the requirements of the river improvement plan relative to their bridges and crossings.

The mandatory injunction to which plaintiffs are entitled, and which are hereby awarded them, requiring the Lake Shore & Michigan Southern Railway Company, the Buffalo Creek Railroad Company, the Pennsylvania Railroad Company, and the New York, Chicago & St. Louis Railroad Company to provide openings in their approaches in the flood channel, and the Delaware, Lackawanna & Western Railroad Company to remove the stone thrown into the river at its lower bridge, will be suspended and withheld until such defendants refuse to comply with the requirements of the river improvement plans relative to its bridges and manner of crossing such river.

The mandatory injunction against the city of Buffalo requiring the restoration of the Abbott Road crossing of the flood channel to its former condition will be suspended and withheld until the city shall have a reasonable time in which to provide by contract or otherwise for the execution of the plan of river improvement from just below Abbott Road Bridge upstream at least to the upper Lackawanna Bridge.

The mandatory injunction requiring the defendant Delaware, Lackawanna & Western Railroad Company to remove its embankment from Prenat street to its upper bridge, etc., will be suspended and withheld upon condition that it shall within a reasonable time provide an opening under its upper bridge of at least 4,400 square feet, sectional area, exclusive of piers, below mean water level, so constructive as to permit the free passage of all water in or over such area under its railroad tracks, without obstruction.

While it is true that in places the banks of the river have been raised and industrial enterprises have erected buildings and structures within the flood channel, yet in no instance have such structures obstructed the flow of flood waters down the flood channel, or contributed to the raising of the flood waters above the flood banks at Abbott Road in the vicinity of Hopkins street. At all such places the flood waters have flowed around the structures and have not been set back and contributed to causes that damaged the plaintiffs. The damage to the plaintiffs has been caused solely by the acts of the defendants.

The plaintiffs' lands are situated about one mile south of the Buffalo river, and are bounded on the north by Tifft street, on the east by Hopkins street, on the south by Marilla street, and on the west by the railroad tracks and rights of way of the defendants, the Buffalo, Rochester & Pittsburgh Railroad Company, the South Buffalo Railway Company, the New York, Chicago & St. Louis Railroad Company, the Pennsylvania Railroad Company, the Erie Railroad Company, and the Lake Shore & Michigan Southern Railway Company, consisting of about 150 acres of land. Running through the plaintiffs' lands is Howard creek, which is a small stream with a well-defined

water course, having its source a mile or more distant in the higher lands to the east and southeast and fed by springs along its course, and which, prior to about 1890, flowed westward from plaintiffs' lands through openings under the railroad tracks to the west, finding its way into Lake Erie.

About the year 1890 the defendant the Lake Shore & Michigan Southern Railway Company filled in all the openings under its tracks with solid earth embankments, completely shutting off the water of this Howard creek water course from outlet to the lake. The Erie Railroad Company, the Pennsylvania Railroad Company, the New York, Chicago & St. Louis Railroad Company, and the Buffalo, Rochester & Pittsburgh Railroad Company filled in the openings under their tracks in the water course of Howard creek, leaving certain culverts and placing various sized iron pipe, improperly located and of insufficient size to be of effective service in allowing the water of such water course to flow from plaintiffs' premises, and substantially shutting off the water of Howard creek from the lake, except as such waters found outlet through ditches running northerly on the east of the various railroad embankments to the Buffalo river. About the year 1900 the South Buffalo Railway Company constructed an embankment across the water course of Howard creek upon its right of way located just east of and adjoining the rights of way of the railroads to the west of plaintiffs' lands. In such construction the South Buffalo Railway Company completely filled in such water course and left no opening in its embankment whatever, except a 24-inch iron pipe so located and constructed as to be of little, if any, service in allowing the water from the plaintiffs' lands to flow away. All the railroads to the west of plaintiffs' lands have attempted to take care of the water naturally flowing through the water course of the Howard creek by constructing ditches northerly from such water course along the east side of their various embankments to the Buffalo river; but such ditches have proved to be utterly inadequate for such purpose. At a point about half a mile north from the Howard creek water course, all of such ditches are run on a higher level than a part of plaintiffs' lands. At a time when the water in the Buffalo river at the Buffalo Creek Railroad Bridge is at a height of 4.25 feet above city datum, water flows from the river south through these ditches over the high point in the ditches into the Howard creek water course onto plaintiffs' premises, adding to the water flowing over the river flood channel at Abbott Road, and southwesterly onto plaintiffs' premises. All these ditches have been uncared for, allowed to fill up with weeds and rank growth, and serve no useful purpose in draining the lands of the plaintiffs.

The acts of the defendant railroad companies owning rights of way to the west of plaintiffs' premises in closing up and damming the water course were in violation of plaintiffs' rights to have the ordinary outlet and water course open and unobstructed. The failure to observe these rights was negligence, and they became liable for the damages accruing therefrom. The various conveyances from plaintiffs' ancestors to the defendant railroad companies afford no justification for the closing up of Howard creek. The fact that each of these con-

veyances contains a covenant on the part of the grantee to construct and maintain proper ditches of sufficient depth to carry off the water might possibly restrict plaintiffs to an action for breach of these covenants in the event they fail to so construct the ditches. It is quite likely that the damages occasioned by breach of these covenants plaintiffs cannot recover in this action; but it is not for failure to comply with these covenants that plaintiffs seek relief. It is to recover damages for flooding their property by damming up Howard creek, setting back its waters on plaintiffs' lands, and retaining those waters, together with the waters flowing thereon in times of flood from the Buffalo river at Abbott Road. The compliance with the terms of these covenants might be a defense to this action, provided such compliance kept plaintiffs' lands free from the flooded conditions created by defendants' acts; but a failure to comply with such covenants is no answer to the assertion that it was wrong to fill in those embankments in such a manner that all flow of water in ordinary times or in times of ordinary floods was prevented. In 1850 the Lake Shore & Michigan Southern Railway Company originally constructed its road across this Howard creek on open trestle work and maintained such openings for about 40 years. During that time the present Erie Railroad Company, the Pennsylvania Railroad Company, the New York, Chicago & St. Louis Railroad Company, and the Buffalo, Rochester & Pittsburgh Railroad Company constructed their embankments with proper and sufficient openings for the water of Howard creek and ordinary flood waters coming on plaintiffs' lands from the Buffalo river at Abbott Road to pass off to the lake, and such openings were maintained for years.

To say that the covenants in these various conveyances to the railroads, made at a time when these openings were maintained and Howard creek waters and ordinary flood waters were passing through them out to the lake, were intended to confer authority to dam up the creek, close the openings, and force the owners of the Howard farm to solely have recourse to an action for damages for breach of covenant to make proper ditches for drainage, is not warranted by the facts. Proper ditches for drainage does not necessarily mean a ditch large enough to carry a great flood, or such an ordinary flood as might likely be expected. It is quite possible that a proper ditch for drainage means simply a ditch of sufficient grade, depth, and width to drain the soil from accumulated water therein. The very language of these covenants precludes the idea that it was ever intended by any party to them that the waters of Howard creek in such ordinary floods as might likely be expected were to be taken care of by these ditches. The very fact that such waters were taken care of for 40 years after the Lake Shore & Michigan Southern Railway was built, by openings under its tracks, and for years after the construction of the other railroads, by like openings, is so repugnant to the idea of authority to close the water course that such a construction of the conveyances cannot be maintained. At the time the South Buffalo Railway Company's embankment was built in 1900, the plaintiffs' land was being periodically flooded by reason of the railroads to the west of its right of way having closed the openings under their tracks, and by reason of flood

water from Buffalo river at Abbott Road, and such fact was well known—it could have been seen by any interested observer. It was very apparent that the alleged ditches north from the Howard creek to the Buffalo river were inadequate and useless. The South Buffalo Railway Company constructed its railroad upon an embankment along the west side of plaintiffs' land, and placed one opening in it of 24 inches diameter, so placed through its embankment as to be utterly inadequate to carry the waters ordinarily expected to flow across its right of way. Such failure to provide sufficient openings was negligence and has contributed to plaintiffs' damages.

It is asserted, however, that the conveyance by the plaintiffs on September 5, 1900, to the South Buffalo Railway Company of the premises now occupied by that defendant expressly granted the right to construct its railroad upon a solid fill or embankment from 8 to 15 feet high, and that by reason of such grant the plaintiffs cannot recover any damages caused by such constructed embankment. The difficulty with such contention is that the grant referred to does not authorize such construction. The deed describes the premises conveyed, using the following words as a part of such description, viz.:

"Center line of the railway of the party of the second part, as laid down upon a map of such railway filed in the office of the clerk of the county of Erie on the 17th day of August, 1900."

The map referred to was introduced in evidence, and shows, in addition to the location of the railroad, a profile of the same giving the elevations as completed. Because such profile shows no openings in the proposed embankments at the Howard creek water course, it is argued that the deed of September 5, 1900, is a grant of the privilege of constructing the railroad with a water-tight embankment across such water course. The reference to the map in the deed is for the mere purpose of fixing the place of the center line of such proposed railroad as surveyed, to the end that the premises conveyed shall extend 86 feet easterly of such line. The profile attached to such map is not referred to in the deed, and the purpose for which reference is made to the map has nothing whatever to do with the profile. The mere fact that the profile is upon the map, and that the profile does not show any proposed openings in the elevated embankments, did not relieve the South Buffalo Railway Company from its statutory obligation to restore the Howard creek water course to its former state of usefulness, or to such state as not to have unnecessarily impaired the same.

On March 22, 1910, leave was granted defendants to introduce in evidence a contract made by the plaintiffs, the Lackawanna Steel Company, and the defendant South Buffalo Railway Company on the 12th day of February, 1910, in and by which the plaintiffs agreed on or before April 1, 1910, to convey to the defendant South Buffalo Railway Company a strip of land on the western edge of their premises 16 feet wide, extending from the center line of Tifft street southerly to the right of way of the Buffalo, Rochester & Pittsburgh Railroad, and thence southeasterly to Hopkins street. The defendant South Buffalo Railway Company covenanted to construct a ditch along the

easterly and westerly side of such strip placed suitable for drainage, and also that it would construct a ditch suitable for drainage on the southerly side of a part of such strip leading from Hopkins street to and into the ditch of the Buffalo, Rochester & Pittsburgh Railroad; it being stated in such contract that it was intended to construct a railroad switch track located on an earth embankment upon the premises to be conveyed. And it was provided that, as the embankment on a portion of said premises would not admit of the construction of ditches on the premises conveyed, the plaintiffs' lands adjoining the premises conveyed, not exceeding four feet in width, might be used for such ditches. The defendant South Buffalo Railway Company agreed in said contract to construct, at its own cost and expense on or before May 1, 1910, a switch, as delineated on a plan attached to such contract, crossing at Tifft street and running southerly upon an earth embankment to within about 500 feet of Hopkins street; the elevation of such embankment to be as indicated on such plan. From the plan attached to said contract it appears that such embankment is to be from 7 to 10 feet. Nothing appears upon the plans to indicate any openings in the embankment for the passage of water.

It is the contention of the defendants that the plaintiffs by this conveyance has provided for a water-tight embankment, to be constructed across Howard creek water course; that all claims for future damages by reason of obstructing such water course have been destroyed, and the plaintiffs' right to injunctive relief to compel the defendants to restore the water course through their embankments already in existence has been lost. It is very apparent that, if the defendants' construction of the contract of February 12, 1910, is to be upheld, there will be no necessity for any openings in defendants' embankments to take care of any water flowing from the plaintiffs' lands, for the reason that no water will get through the proposed embankment, and such construction would certainly defeat the plaintiffs' claim for injunctive relief.

Section 11 of the railroad law (Laws 1890, c. 565) provides that every railroad corporation which shall build its road across any stream or water course shall restore the stream or water course to its former state, or to such state as not to have unnecessarily impaired its usefulness. The embankment of the South Buffalo Railway Company, provided for by the contract of February 12, 1910, has not been constructed. It is entirely practicable to place in the bed of Howard creek water course three or four 36-inch iron pipes, which will provide the needed outlet to Howard creek. The embankment built over such pipe would serve all the purposes contemplated by the contract. The expense of furnishing such pipes will be trifling compared with the injury occasioned by omitting to provide an outlet. It is very apparent that the claim of the defendants that plaintiffs have contracted away their right to have a practical and serviceable outlet for the water of Howard creek water course is not based upon a desire of the South Buffalo Railway Company to be relieved from the duty of constructing its proposed embankments so as not to have impaired the usefulness of the Howard creek water course as a practical water course, but is based upon the desire of the defendants to be relieved from the neces-

sity of reconstructing their ditches from Howard creek to the Buffalo river, so as to make them practical for drainage purposes or of opening waterways through their embankments.

While it is true that the contract of February 12, 1910, is silent as to any required openings through the proposed new embankment of the South Buffalo Railway Company, yet the mere fact that the plan attached to such contract shows no water course openings is not satisfactory evidence that the plaintiffs have agreed that no such openings need be provided; neither is the fact that the contract calls for an earth embankment seven feet high any evidence that the plaintiffs have stipulated that a solid, impermeable water-tight embankment may be constructed through the Howard creek water course. While it is true that the benefits secured by section 11 of the railroad law are for the private advantage of the plaintiffs, and are susceptible of being granted or conveyed away, yet is it true that the obligation of the South Buffalo Railway Company, in constructing the proposed embankment, to restore the Howard creek water course to its former state of usefulness has been released by this contract? It is provided that the South Buffalo Railway Company shall construct a ditch on the east side of its newly acquired right of way four feet wide suitable for drainage. What possible necessity for such provision could exist, if the only practical outlet for such a ditch was to be completely closed by the earth embankment? There is no feasible plan for an outlet to this proposed ditch, except through the new embankment. It is impossible to make a ditch of any specified depth, grade, or width that would be suitable for drainage unless the waters accumulating therein will run off or drain into something away from the land to be drained. This ditch is to be about 2,500 feet long, located along the lower and western edge of upwards of 150 acres of plaintiffs' lands, and will receive the surface water of several hundred acres in addition to the natural water of Howard creek. The ditch is designed to drain the Howard farm. The fact that the parties contracted that the ditch must be so constructed as to be suitable for drainage means that it is to be more than a mere excavation with no outlet. It means that the South Buffalo Railway Company must connect it with something whereby the ditch itself can be drained. Before the conclusion can be reached that the plaintiffs have contracted away their rights under the statute, it clearly ought to appear from the contract itself that it is provided therein that there shall be no openings through the proposed embankment. All that does appear is that the plan or map is silent as to any openings, and the embankment is described in the contract as an earth embankment. The plan shows no fences, and yet it could not be successfully maintained that the plaintiffs have relieved the railroad company from its statutory obligation to build and maintain fences. The reasoning is that because plaintiffs have stipulated for an earth embankment it cannot consist of earth filled in over iron pipes; that it cannot consist of an opening bridged for railroad work; that it must consist of nothing but earth. While the contract does specify earth embankment, yet it could not be successfully claimed that the plaintiffs have contracted away their statutory right to have a farm crossing

where necessary, simply because the putting of planks across the top of this embankment for such crossing would change the earth embankment to one of earth and plank. A suitable opening through this proposed embankment cannot be dispensed with if the four-foot ditch is to be made suitable for drainage. The necessities for such an opening are so grave, the expense thereof so comparatively trifling, the advantages so great, the failure of the contract to specifically provide that no openings are to be made is so apparent, that it is impossible to reach the conclusion that the plaintiffs have forfeited their right to compel the South Buffalo Railway Company to restore the Howard creek water course to its former state of usefulness in constructing the proposed embankment.

The plaintiff is entitled to a mandatory injunction requiring the defendants, the Lake Shore & Michigan Southern Railway Company, the Erie Railroad Company, the New York, Chicago & St. Louis Railroad Company, the Pennsylvania Railroad Company, the Buffalo, Rochester & Pittsburgh Railroad Company, and the South Buffalo Railway Company, to restore the water course of Howard creek to its former condition; to provide and maintain suitable and proper openings of at least 40 square feet sectional area in size in their embankments across the water course of Howard creek, the bottom thereof to be below one foot above city datum, at proper grade, so as to permit all the water in said water course at all times to flow from the plaintiffs' premises and pass through such embankments.

Much of the damage to plaintiffs' lands is caused by floods from Buffalo river, due to obstructions therein that are to be removed. Such removal will relieve the necessity for larger openings than above provided for through the railroad embankments to the west of plaintiffs' premises. It is very apparent that if a 24-inch opening through the present embankment of the South Buffalo Railway Company was enlarged to three times its present capacity and lowered 18 inches, and the ditches from the Howard creek water course north to the Buffalo river were cleaned out and deepened so as to permit all the water therein to drain away, and such openings as are now in such railroad embankments cleaned out, lowered, and made practical for drainage purposes, and some practical and systematic attention given to their effective maintenance, there would be no necessity for the openings directed to be made by mandatory injunction herein provided for.

For the purpose of affording an opportunity of putting the present openings in the embankments to the west of plaintiffs' premises and the ditches to the Buffalo river in a practical, serviceable condition so as to be suitable for drainage, without the expense of complying with the provisions of the mandatory injunction herein provided for, the issuing of such injunction will be withheld a reasonable time.

About 25 acres of plaintiffs' lands have been rendered useless for 10 years by the acts of the defendants in obstructing Buffalo river, causing its ordinary flood waters to flow upon plaintiffs' premises, and preventing the same from flowing therefrom, and if the obstructions created by the defendants in the Buffalo river and Howard creek water course were to be deemed permanent, the plaintiff would be en-

titled to recover in this action the value of the 25 acres, about $50,000, together with such additional sum as would be fair compensation for damages occasioned other portions of plaintiffs' lands that have not been rendered entirely useless. The measure of damages, however, is not compensation for permanent injury, for the reason that the damages are not permanent. The obstruction created by the defendants cannot be treated as permanent, for the reason that they are to be removed under and in pursuance of the judgment to be entered hereon.

The correct measure of damages seems to be the depreciation in the value of the annual use of the plaintiffs' premises that has been caused by the acts of the defendants. It is undisputed that the plaintiffs' premises have a fair rental value of $1,000 per annum, freed from the flood conditions caused by. the defendants' negligent acts; that in its condition, as flooded by the defendants, such rental value is the sum of $450.

While it is true that plaintiffs' lands have been annually flooded for more than six years prior to 1906, the time of the commencement of this action, the damages have been of a more permanent character since 1902; the depreciated rental value, however, being $550 for the past 10 years.

The plaintiffs are entitled to recover such depreciated rental value for six years prior to the commencement of this action and for the four years of the pendency of the same, a period of ten years, viz., the sum of $5,500. The acts causing this damage were not the joint acts of all the defendants. The two defendants, the Pennsylvania Railroad Company and the New York, Chicago & St. Louis Railroad Company, jointly committed the acts relative to the obstructions in the Buffalo river by filling in the openings in the approaches to their joint bridge, and also the acts relative to the filling in of the openings through their joint embankment across the Howard creek water course. The acts of the remaining defendants in placing obstructions in the Buffalo river and across the Howard creek water course were all committed at different times and places and were the separate acts of each defendant. Each of such defendants thus becomes solely liable for the damages it separately has occasioned. To fix and ascertain the exact amount of damage for which each defendant is liable may be an impossibility; but no more impossible than to exactly determine the total damages inflicted by all the defendants. In view of the character of the obstructions, the acts of the defendants, the relation existing between these acts and the damages occasioned, the plaintiffs are entitled to recover from the defendants the following sums:

The city of Buffalo, the sum of $600; the Lake Shore & Michigan Southern Railway Company, the sum of $1,000; the Pennsylvania Railroad Company and the New York, Chicago & St. Louis Railroad Company, jointly, the sum of $700; the Buffalo Creek Railroad Company, the sum of $500; the Delaware, Lackawanna & Western Railroad Company, the sum of $1,700; the Erie Railroad Company, the sum of $300; the Buffalo, Rochester & Pittsburgh Railroad Company, the sum of $300; and the South Buffalo Railway Company, the sum of $400.

Judgment is accordingly ordered, with costs against all the defendants. This being a difficult and extraordinary case, an extra allowance of 5 per cent. is awarded the plaintiffs.

Let findings be prepared in accordance with this opinion.